Opinion for the court filed by Chief Judge PROST. Dissenting opinion filed by Circuit Judge BRYSON.
PROST, Chief Judge.
Eon Corp. IP Holdings LLC (“Eon”) filed this suit against Silver Spring Networks, Inc. (“Silver Spring”), a utility services network provider, alleging that Silver Spring infringed three of Eon’s patents relating to networks for two-way interactive communications. Following a five-day trial, the jury found the asserted claims valid and infringed, and awarded Eon $18,800,000. On Silver Spring’s motion for judgment as a matter of law, the district court reversed the jury verdict as to one of the three patents but upheld it as to the other two. The court also remitted the damages award to $12,990,800.
Silver Spring appeals to us, raising challenges regarding claim construction, infringement, and damages. Because we find that no reasonable jury could have found that Silver Spring’s utility meters infringe the two remaining patents, we reverse.
I
Eon asserted three patents in this suit: U.S. Patent No. 5,388,101 (“'101 patent”), U.S. Patent No. 5,481,546 (“'546 patent”), and U.S. Patent No. 5,592,491 (“'491 patent”). All three relate to a two-way interactive communication network system for enabling communications between local subscribers and a base station. The '101 and '546 patents, which share the same specification, describe various problems with the prior art networks: in the presence of heavy subscriber activity, exchanges could get jammed, thereby preventing real-time communications; and base stations were unable to service low-power subscriber units that transmitted in only the milliwatt power range. The '101 and '546 patents describe overcoming these problems by using synchronously timed communications (to overcome the jamming problems), and by adding local remote receivers throughout a base station area (to overcome the inability of low-power subscriber units to reach the base station). The third asserted patent, the '491 patent, incorporates by reference the '101 patent, and adds onto that network system an additional modem feature, which can be used as an alternate communication path when the subscriber is otherwise unable to communicate into the network.
Eon’s patents describe various contexts in which the described networks might be useful. These contexts include broadcast television programs, wireless facsimile services, pay-per-view services, and when the subscriber unit is located poolside, in the basement, or in some other location where it would otherwise lack ability to receive transmissions. See '101 patent col. 10 11. 65-67; '491 patent col. 1 11. 48-53, col. 5 11. 57-60. Most touted in the patents is the provision of “interactive video data service[s]” that have “[cjapacity for heavy audience participation without substantial delays during peak loading conditions ... in a manner compatible with the FCC licensing conditions for interactive video data service.” '101 patent col. 3 11. 12-16. For example, the patents discuss “live video programs viewed nationwide, such as world series baseball games,” and how such television broadcasts are “interactive for individual subscriber participation.” Id. at col. 1 11. 51-54. In addition to these contexts, the patents also scatter, in a handful of places, references to other con *1317 texts in which the invention might be useful: meter reading, inventory control in soft drink dispensing machines, and site alarms for remote monitoring of open doors, fires, failure, temperature, etc. Id. at col. 6 11. 5-17.
In all the claims found to be infringed, the subscriber unit is required to be either “portable” or “mobile.” [1] The specification provides guidance about what the “portable” and “mobile” terms mean. For example, the patents describe how “low-cost portable battery-operated milliwatt transmitter subscriber units may be moved throughout the base station geographical area....” Id. at col. 4 11. 6-11. They use the term “hand-off’ to describe the movement of portable units “from cell to cell” and “as fringe areas are encountered.” Id. at col. 8 1.63-col. 9 1.3. And they state that “[t]he portability feature made possible by this invention permits such a unit to be moved next, door or put into a car or van for movement within or across cell boundaries with good digital synchronous communication contact within the nationwide network of cells.” Id. at col. 11 11. 6-11. The stated advantages of the invention include “long life battery operated portable subscriber units ... which can be moved through the cell territory,” and overcoming “interfering signals” and “busy signals” that can be “frustrating to the potential using audience.” Id. at col. 2 11. 16-20, col. 6 11.1-4, col. 9 11. 29-30.
In Silver Spring’s system, the accused “portable” and “mobile” subscriber units are electric watt-hour utility meters that are attached to the exterior walls of buildings. During claim construction proceedings, Silver Spring proposed that the terms “portable” and “mobile” be construed as “capable of being easily and conveniently moved from one location where the subscriber unit is operable to a second location where the subscriber unit is operable, and designed to operate without a fixed location.” J.A. 306. In other words, Silver Spring sought a construction for “portable” and “mobile” that “do[es] not cover fixed or stationary products that are only theoretically capable of being moved.” J.A. 307. Eon argued that neither term needed construction, and both could simply be given their plain and ordinary meaning.
The district court agreed with Eon. The court explained that the terms “do not require construction because their meanings are clear in the context of the claims and will be readily understandable to the jury.” J.A. 308. In the court’s view, Silver Spring was “asking for nothing the plain and ordinary meaning of the terms cannot do on their face — distinguish from ‘stationary’ or ‘fixed.’ ” J.A. 307. In deciding the claims needed no construction beyond plain and ordinary meaning, the district court concluded that it had “resolved the parties’ claim scope dispute.” J.A. 308.
During trial, the parties’ experts disputed the meaning of the “portable” and “mobile” limitations. For example, Silver Spring’s expert testified that the terms required that a subscriber unit could be “easily moved from one location to another,” J.A. 791, while Eon’s expert testified that the terms merely meant that a subscriber unit must be “capable of being easily moved ... but not that it actually' has to move,” J.A. 616. Eon’s expert essentially opined that the terms would include anything that was movable, including a house, which can be moved “lock, stock, and barrel.” J.A. 641. In the expert’s *1318 view, “that’s the kind of the world we’re living in ... everyone is sort of — increasingly there are more and more things that are mobile.” Id.
Following the five-day trial, the jury found the asserted claims valid and infringed. On Silver Spring’s motion for judgment as a matter of law, the court reversed the jury verdict as to the '546 patent (for reasons unrelated to the “portable” and “mobile” limitations), but upheld it as to the '101 and '491 patents, rejecting Silver Spring’s argument that the evidence did not support the jury’s finding that Silver Spring’s meters meet the “portable” and “mobile” limitations.
Silver Spring appeals a number of issues regarding claim construction, infringement, and damages. We have jurisdiction pursuant to 28 U.S.C. § 1295. The district court’s denial of a motion for judgment as a matter of law is reviewed de novo. Mirror Worlds, LLC v. Apple Inc., 692 F.3d 1351, 1356 (Fed.Cir.2012); Med. Care Am., Inc. v. Nat’l Union Fire Ins. Co., 341 F.3d 415, 420 (5th Cir.2003). The district court’s claim construction is reviewed under the standard set forth in Teva Pharm. USA Inc. v. Sandoz, Inc., — U.S. -, 135 S.Ct. 831, 841, — L.Ed.2d-(2015). The jury’s infringement determination is a question of fact reviewed for substantial evidence. Mirror Worlds, 692 F.3d at 1356.
II
We begin with Silver Spring’s challenge regarding the “portable” and “mobile” limitations, which is two-fold. First, Silver Spring argues that the court’s decision not to construe the terms improperly delegated to the jury the task of determining claim scope, in violation of 02 Micro International, Ltd. v. Beyond Innovation Technology Co., 521 F.3d 1351 (Fed.Cir.2008). Second, Silver Spring argues that no reasonable jury could have found infringement, as the plain, and ordinary meaning of the terms cannot encompass Silver Spring’s products. Eon responds that the court was correct in not further construing the claim terms, and that the jury’s verdict is supported by the evidence.
We agree with Silver Spring on both points. In 02 Micro, this court held that “[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court’s duty to resolve it.” 521 F.3d at 1362. This duty resides with the court because, of course, “the ultimate question of construction [is] a legal question.” Teva, 135 S.Ct. at 842; see also O2 Micro, 521 F.3d at 1360 (“[T]he court, not the jury, must resolve that dispute.” (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), aff'd 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996))). Thus, “[a] determination that a claim term ‘needs no construction’ or has the ‘plain and ordinary meaning’ may be inadequate when a term has more than one ‘ordinary’ meaning or when reliance on a term’s ‘ordinary’ meaning does not resolve the parties’ dispute.” O2 Micro, 521 F.3d at 1361.
Of course, a court need not attempt the impossible task of resolving all questions of meaning with absolute, univocal finality. Such an endeavor could proceed ad infinitum, as every word — whether a claim term itself, or the words a court uses to construe a claim term — is susceptible to further definition, elucidation, and explanation. We have therefore often observed that “a sound claim construction need not always purge every shred of ambiguity.” Acumed LLC v. Stryker Corp., 483 F.3d 800, 806 (Fed.Cir.2007); see also Vivid Techs., Inc. v. Am. Science & Eng’g, Inc., 200 F.3d 795, 803, (Fed.Cir.1999) (“[0]nly those terms need be construed *1319 that are in controversy, and only to the extent necessary to resolve the controversy.”); PPG Indus, v. Guardian Indus. Corp., 156 F.3d 1351, 1355 (Fed.Cir.1998) (“[A]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact.”); Function Media, L.L.C. v. Google, Inc., 708 F.3d 1310, 1326 (Fed.Cir.2013) (“Nearly every patent case will involve some amount of ‘word games,’ because claims and claim constructions are, after all, just words.”). Indeed, we noted in 02 Micro that there are limits to the court’s duties at the claim construction stage. 521 F.3d at 1362. For example, courts should not resolve questions that do not go to claim scope, but instead go to infringement, Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc., 628 F.3d 1359, 1376 (Fed.Cir.2010), or improper attorney argument, Verizon Servs. Corp. v. Cox Fibernet Va., Inc., 602 F.3d 1325, 1334 (Fed.Cir.2010).
Thus, a district court’s duty, at the claim construction stage is, simply, the one that we described in 02 Micro and many times before: to resolve a dispute about claim scope that has been raised by the parties. O2 Micro, 521 F.3d at 1360 (“When the parties raise an actual dispute regarding the proper scope of [the] claims, the court, not the jury, must resolve that dispute.”); AFG Indus., Inc. v. Cardinal IG Co., 239 F.3d 1239, 1247 (Fed.Cir.2001) (“It is critical for trial courts to set forth an express construction of the material claim terms in dispute.”); Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1366 (Fed.Cir.2004) (“[T]he district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to ‘intelligently determine the questions presented.’ ” (citation omitted)); see also Every Penny Counts, Inc. v. Am. Express Co., 563 F.3d 1378, 1383 (Fed.Cir.2009) (“[T]he court’s obligation is to ensure that questions of the scope of the patent claims are not left to the jury. In order to fulfill this obligation, the court must see to it that disputes concerning the scope of the patent claims are fully resolved.” (citation omitted)); TNS Media Research, LLC v. Tivo Research & Analytics, Inc., No.2014-1668, 629 Fed.Appx. 916, 938, 2015 WL 5439002, at *22 (Fed.Cir. Sept. 16, 2015) (“[W]hen a determinative claim construction dispute arises, a district court must resolve it.”).
Here, the court did not resolve the parties’ dispute by instructing the jury that the claims should be given their plain and ordinary meaning. During claim construction, the parties actively disputed the scope of the “portable” and “mobile” terms. The crucial question was whether, as Silver Spring argued, the terms should not be construed so broadly such that they covered “fixed or stationary products that are only theoretically capable of being moved.” J.A. 307. By determining only that the terms should be given their plain and ordinary meaning, the court left this question of claim scope unanswered, leaving it for the jury to decide. This was legal error. 02 Micro, 521 F.3d at 1362.[2]
The dissent contends that the court did, in fact, resolve the parties’ dispute by rejecting Silver Spring’s “special definition” in favor of plain and ordinary meaning. *1320 Dissent at 1329-30. But simply rejecting one proposed construction does not mean that a general jury instruction to give terms their plain and ordinary meaning resolves the relevant dispute. The court remained obligated to provide the jury with a clear understanding of the disputed claim scope- — -and the continuing debate as to the meaning of “portable” and “mobile” during the trial belies the court’s boilerplate assertion that it did so. Indeed, the dissent acknowledges that under 02 Micro, “an instruction giving a term its ‘plain and ordinary meaning’ may be inadequate when the term has more than one ordinary meaning or when reliance on the term’s ordinary meaning does not resolve the parties’ dispute.” Id. (citing 02 Micro, 521 F.3d at 1361). Those are precisely the circumstances of this case.
Having concluded that the court erred by simply instructing the jury to give the terms “portable” and “mobile” their plain and ordinary meaning, we next consider whether remand for a new trial is appropriate. Here, it is clear that no remand is necessary because, when the claim terms are properly construed, no reasonable jury could have found that Silver Spring’s electric utility meters infringe.[3]
We begin, as Phillips instructs, with the principle that claims terms are generally given their ordinary and customary meaning. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc). The ordinary meaning of a claim term is not “the meaning of the term in the abstract.” Id. at 1321. Instead, “the ‘ordinary meaning’ of a claim term is its meaning to the ordinary artisan after reading the entire patent.” Id.; see also Netword, LLC v. Centraal Corp., 242 F.3d 1347, 1352 (Fed.Cir.2001) (“The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose.”); Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1299 (Fed.Cir.1999) (“Determining the limits of a patent claim requires understanding its terms in the context in which they were used by the inventor, considered by the examiner, and understood in the field of the invention.”).
A party is, therefore, “not entitled to a claim construction divorced from the context of the written description and prosecution history.” Nystrom v. TREX Co., Inc., 424 F.3d 1136, 1144-45 (Fed.Cir.2005). Ordinary meaning is not something that is determined “in a vacuum.” Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed.Cir.2005). To the contrary, “a word describing patented technology takes its definition from the context in which it was used by the inventor.” Anderson v. Int’l Eng’g & Mfg., Inc., 160 F.3d 1345, 1348-49 (Fed.Cir.1998).
The dissent runs afoul of these proscriptions by concluding that the “portable” and “mobile” terms have a settled “plain and ordinary meaning,” writing that “the close parallelism of all the dictionary definitions indicates there is only one plain and ordinary meaning,” and relying in part on an example not found in the patents, an ordinary household fuse. Dissent at 1329-30. This approach is problematic for at least two reasons. First, it is evident from the parties’ dispute that there is not a single, accepted meaning of the terms — indeed, a significant portion of the trial was devoted to testimony aimed at elucidating the *1321 metes and bounds of the “portable” and “mobile” terms. More importantly, however, the question is not whether there is a settled ordinary meaning of the terms in some abstract sense of the words. Rather, as we recently explained, “The only meaning that matters in claim construction is the meaning in the context of the patent.” Trs. of Columbia Univ. v. Symantec Corp., 811 F.3d 1359, 1363 (Fed.Cir.2016).
Here, the common disclosure of the '101 and '491 patents provides extensive guidance about the terms “portable” and “mobile.” The specification describes the claimed units as “low-cost portable battery operated milliwatt transmitter subscriber units” that “may be moved throughout the base station geographical area.” '101 patent col. 4 11. 6-11; see also id. at col. 6 11. 20-21 (explaining that the portable units may be moved “to different locations in a house, office, or car”). It differentiates the claimed “portable” and “mobile” units from other, non-claimed “fixed” and “stationary” units. Id. at col. 1 11. 16-18 (“[T]he subscriber units comprise low energy, stationary and mobile, digital transceivers.” (emphasis added)). And it describes how, during movement across cell boundaries, the portable units maintain “good digital synchronous communication contact within the nationwide network of cells.” Id. at col. 11 11. 6-11. In sum, the specification’s guidance on the claimed “portable” and “mobile” units is that they are low-power, battery operated units that are easily transported between different locations in a house, office, car, or throughout a cell territory.
This guidance from the specification belies Eon’s position at trial that the claim terms “portable” and “mobile” should be broadly interpreted as including, essentially, anything that is theoretically capable of being moved. Before the jury, Eon’s experts testified that “portable” simply meant something that was “capable of being easily moved ... but not that it actually has to move.” J.A. 616. Their testimony was that the terms would include anything that was movable, which could include a house, perhaps, but not a mountain. J.A. 641. Eon’s position was, essentially, that because Silver Spring’s meters could be moved, they satisfied the claims’ portability feature.
Eon’s position is completely untethered to the context of the invention in this case. Although the terms “portable” and “mobile” might theoretically, in the abstract, be given such a broad meaning, they cannot be construed that way in the context of the '101 and '491 patents. Phillips, 415 F.3d at 1321. The patents consistently describe the “portability” feature of the invention as the movement of a low-power subscriber unit across cell boundaries, with good digital synchronous communication contact throughout the. network. This context must be considered in determining the ordinary meaning, as the “construction that stays true to the claim language and most naturally aligns with the patent’s description of the invention will be, in the end, the correct construction.” Renishaw PLC v. Marposs Societa’ per Azioni, 158 F.3d 1243, 1250 (Fed.Cir.1998).
Read in their appropriate context, the terms “portable” and “mobile” cannot be construed as covering the accused meters in this case. The evidence showed that Silver Spring’s electric utility meters are affixed to the exterior walls of buildings by being “bolt[ed] ... down”; that they are connected via a wire containing “240 volts”; and they are secured in place via an additional “locking collar” and “tamper seal.” J.A. 559. The meters are “not the owner' of the house’s property,” but instead are the “electric utility’s property,” who “don’t want the meters to be moved *1322 ... [or] in any way tampered with.” Id. A certified electrician is required to install or remove a meter. J.A. 559, 521. The meters are not intended to be moved from building to building, they are usually left in place for fifteen years, and there was no evidence that a meter was ever detached from one building and reattached to another. J.A. 559, 521, 791. Put simply, the meter is “[b]olted to the house. That’s where it’s used. It doesn’t change.” . J.A. 592. Under no permissible construction of the terms “portable” and “mobile” — given their ordinary meaning in the context of the '101 and '491 patents — could a reasonable jury have found that Silver Spring’s electric utility meters infringe the asserted claims.
Both Eon and the dissent make much of passing references in the specification; Eon relies on references to “meter reading” and the dissent relies on references to “inventory control in soft drink dispensing machines” and “site alarms.” These minor mentions in the specification do not warrant a broader construction of the claims’ portability requirement. Taking these items in order of relevance, Eon argues that the specification’s few references to “meter reading” are an express disclosure that “meters” such as Silver Spring’s meet the claims’ portability requirement. But the specification does not say what Eon contends. What the specification actually says is that portable subscriber units “may be moved through the base station geographical ■ area for reliably performing such functions as meter reading.” '101 patent col. 4 11. 8-12 (emphasis added). Thus, what the patents describe is that a portable battery-operated subscriber unit may be brought to the location of the meter for reading it. The patent therefore indicates that electric utility meters such as Silver Spring’s are not the portable subscriber units recited in the claims.
Likewise, with respect to the specification’s references to “inventory control in soft drink dispensing machines” and “site alarms,” the specification’s brief discussion of such embodiments — once in the abstract and twice in the body — is so limited that it is impossible to tell what component of such embodiments is the portable feature. See '101 patent abstract, col. 6 11. 5-8, col. 10 11. 25-28. Certainly, the patents do not state, as the dissent seems to assume, that the portable feature of these embodiments are the soft drink dispensing machines and alarm devices themselves. Dissent at 1327-28. The most that can be gleaned from the specification’s limited references to these embodiments is that there may be some portable aspect involved in the overall system.
The remainder of the relied-upon portions of the specification are similarly deficient in supporting a broader construction. The dissent states that “the '491 specification refers to the subscriber units as having the capacity ‘to collect data from a number of home appliances, etc,’ ” arguing that “that is exactly the function that is performed by the accused meters in this case.” Id. at 1328 (quoting '491 patent col. 6 11. 1-2). But the dissent ignores the thrust and context of the cited paragraph, which is directed to specific advantages for things such as “wireless facsimile service” and “pay-per-view services,” or in circumstances “when the subscriber unit is located, for example, at a poolside,” or when “numerous subscriber units placed within homes located, for example, along a single street or within the same neighborhood.” 491 patent col. 5 11. 55-67. Those examples do not support the dissent’s broad construction of the claims’ portability requirement.
Nor are we persuaded by Eon’s argument that “a meter ‘moves’ from one geographic zone to another when it switches *1323 communication paths from its primary access point to its secondary access point due to some other obstruction to the communication.” Eon’s Br. 31-32. There is no support whatsoever in the specification for Eon’s assertion. Every reference to movement in the specification is to physical movement throughout a geographic area. Eon’s theoretical view that “portable” and “mobile” do not require physical movement strays much too far afield from the claimed invention.
In sum, nothing in the specification supports a conclusion that the claims’ portability feature is broad enough to include Silver Spring’s accused devices. The crux of the dissenting opinion seems to rest on the small size of the meters and the fact that they can be installed by hand, and on charges that we erroneously require “actual movement” and “battery operation” as part of the claim terms’ ordinary meaning. Dissent at 1324-27. But we do not import such requirements into the claims. Rather, we simply read the claims in the context of the specification — which describes movement of portable units across cell boundaries to facilitate (for example) mobile viewing of world series baseball games — to conclude that utility meters, which spend their fifteen-year lifespan attached to the side of a single house, do not meet the claim requirements of portability and mobility.
Ill
We find unpersuasive the remainder of Eon’s arguments regarding the portability feature, including those relating to waiver. Because no reasonable jury could have found that Silver Spring’s devices are “portable” and “mobile” in the context of the claimed invention, we reverse the judgment below, and do not reach Silver Spring’s additional arguments. ■

. The claims at issue are claims 19 and 20 of the '101 patent, and claims 1 and 2 of the '491 patent. The parties agree that the terms “portable” and “mobile” carry the same meaning and can be construed the same.

. Although the court somewhat acknowledged the importance of context in determining claim scope, see J.A. 308 (finding the terms’ meanings clear "in the context of the claims” and precluding the parties from interpreting the terms "in a manner inconsistent with this opinion"), the court’s error lied in failing to provide the necessary context to the jury.

. The dissent contends that, assuming the court erred in failing to construe the claims, “the remedy would be, at most, a new trial.’’ Dissent at 1329. But a new trial is not necessary when, as here, the record evidence does not support an infringement verdict under the correct construction of the claims.